# Foreign Relations
## of the
# United States
### Diplomatic Papers
# 1939
(In Five Volumes)

## Volume IV

### The Far East
### The Near East and Africa



United States
Government Printing Office
Washington : 1955



DEPARTMENT OF STATE PUBLICATION 5849

For sale by the
Superintendent of Documents, U.S. Government Printing Office
Washington 25, D.C. - Price $5.50 (Buckram)



4    JUN 3 0
Copy    1955

# MOROCCO

## PROPOSED ABOLITION OF CAPITULATORY RIGHTS OF THE UNITED STATES IN THE FRENCH ZONE OF MOROCCO [1]

781.003/172b

*The Secretary of State to the French Ambassador (Saint-Quentin)*

WASHINGTON, January 21, 1939.

EXCELLENCY: Your Excellency will recall that in my note of August 23, 1938,[2] the intention of this Government was expressed to submit to your Government the drafts of a capitulations convention and a treaty of establishment, commerce and navigation concerning the French Zone of the Shereefian Empire.

In now transmitting drafts of those instruments, it has been considered useful, with a view to facilitating examination of the proposed texts, to include certain comments concerning their respective provisions. These comments are given below, beginning with a seriatim examination of the provisions of each article of the proposed capitulations convention and continuing with a general examination of the proposed treaty of establishment, commerce and navigation.

### CAPITULATIONS CONVENTION

*Article 1*

Article 1 is more detailed in character than the corresponding article of the British Convention.[4]  The first paragraph is identical, *mutatis mutandis*, with the single paragraph of the British Convention but the article includes, besides, a subsection (2) of paragraph 2 which corresponds to paragraph 4 of the Protocol annexed to the British Convention and subsection (3) of paragraph 2 which corresponds to paragraph 3 of Article 16 of that Convention.

It will be noted that Article 16 of the Convention of Madrid of 1880 [4] relates to the change of nationality by naturalization.  In view of the proposed termination of this article, along with the other articles of that Convention, it is believed appropriate to suggest the conclusion

---

[1] Continued from *Foreign Relations*, 1928, vol. II, pp. 646–648.
[2] *Ibid.*, p. 885.
[3] Anglo-French Convention for the Abolition of Capitulations in Morocco and Zanzibar, signed at London, July 29, 1937, League of Nations Treaty Series, vol. CLXXXII, p. 351.
[4] Signed at Madrid, July 3, 1880, William M. Malloy (ed.), *Treaties, Conventions, etc., Between the United States of America and Other Powers, 1776–1909* (Washington, Government Printing Office, 1910), vol. I, p. 1220, or 22 Stat. 617.

031

of a treaty of naturalization and military obligations applicable the United States of America and the French Zone of the Shereefian Empire. A draft of such a treaty, identical in substance with treaties in force between the United States and several other countries, is accordingly enclosed.[4]

The articles of the Act of Algeciras,[5] which it is proposed to abrogate, so far as concerns the French Zone of the Shereefian Empire, are identical with those mentioned in the British Convention, with the exception of Articles 51–53 which this Government does not consider necessary for retention. It may be added that, in the event the French Government is disposed to accept the text of subsection (7) of paragraph 2 of Article 6 of the draft convention this Government will be prepared to include among the abrogated articles of the Act of Algeciras all those contained in Chapter V of that Act, namely, Articles 77–104, inclusive, in addition to those now specifically mentioned as subject to abrogation.

*Article 2*

Paragraphs 1 and 2 of this article are identical, *mutatis mutandis* with the corresponding paragraphs of the British Convention. Paragraph 4 of the draft is intended to confer the same rights upon American Chambers of Commerce in French Morocco as are granted to British Chambers of Commerce in the exchange of notes nos. 14 annexed to the British Convention. While paragraph 3 of Article 2 of the British Convention makes the continuance of the provisions of the article after an expiry of ten years subject to the granting of most-favored-nation treatment to subjects and companies of the French Zone as regards the matter referred to in the second paragraph of the article, the fifth paragraph of the present draft proposes to grant such treatment at once.

The third paragraph of the draft convention has no precise counterpart in the British Convention. However, the legislative and administrative non-discrimination therein provided for as affecting American nationals, American-protected persons, American companies, American ships, American aircraft and American goods is but a more explicit interpretation of the principle of economic liberty without any inequality already affirmed in the Act of Algeciras and reaffirmed elsewhere in the draft convention. The emphasis given that principle is a measure of the importance which this Government attaches to its maintenance in Morocco.

---

[4] Not printed; this draft is substantially the same in content, though somewhat different in arrangement, as the Treaty of Naturalization between the United States and Albania, signed at Tirana, April 5, 1932, Department of State Treaty Series No. 892, or 49 Stat. 3241.

[5] *Foreign Relations*, 1906, Pt. II, p. 1495.

MOROCCO                                    633

*Article 3*

Article 3 is, *mutatis mutandis*, identical with Article 3 of the British Convention.

*Article 4*

This article is practically identical with Article 4 of the British Convention except that the second sentence of the final paragraph has been slightly revised to conform with a similar provision of the Franco-Capitulations Convention of May 29, 1937, providing for a period of twelve years rather than an indefinite term for the retention of American consular court records. Article 4 has been further added to provide that such records shall be "kept for" inspection by" rather than "made available to" the tribunals of the French Zone of the Shereefian Empire.

*Article 5*

This article is conformable with Article 5 of the British Convention with the addition of provisions corresponding to the ones listed in paragraph (2) of the Minute and of notes nos. 3, 4, annexed to the British Convention. To obviate the necessity of an annex such as that mentioned in paragraph 5 of Article 5 of the British Convention, American protégés for signal services have been included as entitled to the benefits of the provisions of this article.

*Article 6*

The first paragraph of this article corresponds to the first paragraph of Article 7 of the British Convention, with the addition of a reference to internal taxes, and the interpolation of "and Moroccan" between "French" and "nationals", as well as between "French" and "companies".

Paragraph 2 of Article 6 is a more explicit rendering of the provisions of paragraph 2 of the Protocol of Signature annexed to the British Convention. Moreover, the definition of economic liberty without any inequality herein proposed represents in substance the terms of a similar definition which was accepted verbatim by the British, French and Spanish Governments in 1924 as one of the conditions made by this Government as prerequisite to its adherence to the Tangier Statute. You will recall that the French Government accepted these stipulations in a note dated October 31, 1924 from the French Embassy to the Department.[4]

In the redrafting of the definition, this Government, while conforming as far as possible with the formula agreed upon in 1924, has naturally been moved to take into account forms of economic control

---

[3] Department of State Treaty Series No. 939, or 53 Stat. 1645.
[4] *Foreign Relations*, 1924, vol. II, p. 466.

which have developed since that time and were not then contemplated. The previous agreement of the French Government to a proviso substantially similar in tenor, in relation to the international zone of Tangier, should insure, it is believed, its acceptability under the present circumstances, the more particularly as the general principle of equality of treatment not only forms a part of the existing Act of Algeciras but is embodied in the Protocol of Signature annexed to the British Convention.

The expression "régime of economic liberty without any inequality" has been substituted for the original phrase "régime of economic equality" for the reason that the former, incorporated as it is in the preamble of the Act of Algeciras, has come to have an accepted connotation in respect of Morocco. The interpolations relative to quota and exchange control do not, it is believed, require any special comment. The provision concerning monopolies is identical with that proposed in 1924.

The final provision of Article 6 relates to customs valuation. Subsection (a) is an adaptation in more precise terms of the principle of customs valuation embodied in Article 95 of the Act of Algeciras and in the interpretative paragraph concerning customs valuation included in the Anglo-French Commercial Treaty on French Morocco of July 18, 1938.[*] Moreover, the formula "purchase value" is based on Article 82 of the official French *Observations Préliminaires*, edition 1933, setting forth the basis of customs valuation in France, while the subsection as a whole follows very closely the first paragraph of Article 6, relating to customs valuation, in the Commercial Agreement between France and Belgium of February 23, 1928.[**] Subsection (b) calls for no comment but, of subsection (c), it may be noted that it is an adaptation of Article 85 of the Act of Algeciras. Accordingly, it is presumed that these provisions of Article 6 will commend themselves to the French Government, based as they are either on French practice or on methods defined by the Act of Algeciras.

*Article 7*

Article 7 corresponds to Article 8 of the British Convention but provides for immediate most-favored-nation treatment for Moroccan subjects in the United States.

*Article 8*

Article 8 is identical, *mutatis mutandis*, with Article 9 of the British Convention.

---

[*] British Cmd. 5823, Morocco No. 1 (1938) ; *Treaty . . . Regarding Commercial Relations Between the United Kingdom and the French and Tangier Zones of the Sherifian Empire.*
[**] League of Nations Treaty Series, vol. LXXII, p. 61.

*Article 9*

Article 9 corresponds in general to Article 10 of the British Convention. The first paragraph has been modified to provide that this Government shall have the right to maintain consulates at any place in the French Zone "which is open to the consular representatives of any foreign country". Moreover, the second paragraph reserves to American consular officers, pending the conclusion of a consular convention, the rights, privileges and immunities which they possess at present, other than those of a judicial character under the capitulations.

*Article 10*

The first paragraph of Article 10 corresponds to the whole of Article 11 of the British Convention.   A new paragraph has been added providing for most-favored-nation treatment for American missionaries. There is also added a provision reserving the operation of Article 11 of the Convention revising the General Act of Berlin of February 26, 1885, and the General Act and Declaration of Brussels of July 2, 1890, signed at St. Germain-en-Laye, September 10, 1919.[5]

*Article 11*

Article 11 is identical, *mutatis mutandis*, with Article 12 of the British Convention.

*Articles 12 and 13*

Article 13 of the British Convention was not deemed to be a suitable model for use in a treaty of the United States and, accordingly, this Government proposes two articles relating to estate cases which are standard in the consular conventions of the United States.   Articles similar to Articles 12 and 13 are now in force between the United States and many other countries.   The United States is prepared to give to Moroccan subjects immediate most-favored-nation treatment in the matter of consular rights in relation to the settlement of estates and transmission of proceeds of estates.

*Articles 14 and 15*

Articles 14 and 15 are identical, *mutatis mutandis*, with Articles 14 and 15 of the British Convention.

*Article 16*

The first and second paragraphs of Article 16 correspond to the first two paragraphs of Article 24 of the British Convention, except that the expression "companies" has been given a more comprehensive interpretation in order to make it inclusive both of commercial associations as well as companies.

[5] *Foreign Relations*, 1926, vol. 2, p. 437.

232113—55——41

636        FOREIGN RELATIONS, 1939, VOLUME IV

A third paragraph has been added defining Moroccan subjects, while the fourth paragraph corresponds to the third paragraph of Article 24 of the British Convention with the addition of a clause made necessary by the nonadherence of this Government to the Tangier Statute.

*Article 17*

Article 17 corresponds to Article 25 of the British Convention. It provides for arbitration under the existing treaty of the United States and France,[12] unless the High Contracting Parties agree on some other method of settlement.

*Article 18*

Article 18 is practically identical with Article 26 of the British Convention.

## TREATY OF ESTABLISHMENT, COMMERCE AND NAVIGATION

It will be observed that the enclosed draft treaty of establishment, commerce and navigation[13] includes provisions relating to establishment and navigation, as well as to commerce.  While establishment and navigation provisions are also included in the draft capitulations convention, the nature of that instrument precludes the extension, in all respects, of such provisions to the subjects of His Majesty the Sultan of Morocco in the French Zone of the Shereefian Empire on the basis of reciprocity.   However, the enclosed draft treaty of establishment, commerce and navigation accords rights in the United States to Moroccan nationals, corporations, goods and ships of the French Zone of Morocco, as well as to American nationals, corporations, goods and ships in that Zone.

As the treaty conforms in general with treaties of establishment, commerce and navigation concluded by this Government with many other countries, its provisions are not believed to require any extended comment.

Owing to the non-adherence of this Government to the convention signed at Paris on December 18, 1923,[14] as modified by the agreement of July 25, 1928,[15] regarding the organization of the Statute of the Tangier Zone, and due to the continued exercise by this Government of extraterritorial rights in that Zone, it would not, of course, be practical for the present draft treaty of establishment, commerce and navigation to be extended at this time to the Tangier Zone.  However,

---

[12] Treaty of arbitration, signed February 6, 1928, *Foreign Relations, US*, vol. II, p. 816.
[13] Not printed.
[14] League of Nations Treaty Series, vol. XXVIII, p. 541.
[15] League of Nations Treaty Series, vol. LXXXVII, p. 211.

With a view to insuring uniformity in the customs tariff in the various zones of Morocco, provision has been made in Article XX for the extension of the customs provisions of the treaty, under certain circumstances, to the Spanish Zone of influence and to the Tangier Zone. That article, moreover, makes possible the extension to the Tangier Zone of the quota provisions of the treaty.

With regard to the quota provisions included in the annex to the draft treaty, it may be recalled that in a memorandum presented to the French Government by the American Embassy in Paris on January 24, 1938,[16] it was stated that the United States Government had modified its views that the imposition of quotas and the introduction of similar restrictive systems are a hindrance to that normal and free development of international trade most conducive to the upbuilding of world economy. It was added that if, notwithstanding the position the United States had assumed generally in respect of quotas, the adoption of a quota system in Morocco on a limited list of articles to be agreed upon by the countries most concerned, was looked upon with favor by other interested governments, the United States Government would not wish to appear obstructive in the matter. When presenting this memorandum, the Embassy was informed that as regarded the adoption of a quota system in Morocco, the French Government looked at the matter in the same spirit as that reflected in this Government's communication.

In view of these considerations, my Government is not requesting assurances against the imposition of quantitative restrictions on the importation into French Morocco of products other than those of special interest to the United States numbering at this time some sixty-five items as listed in the Annex.[17] On the other hand, it will no doubt be appreciated that my Government attaches particular importance to the assurances sought from the French Government that quantitative restrictions will not be imposed on the importation into French Morocco of the products referred to in the Annex. Moreover, it will be noted that the value of imports from the United States into French Morocco of the products for which such assurances are sought amounted to an average of only 5.2 percent of the value of total imports of all products from all countries into that Zone for the years 1927 to 1937, as is indicated in the following table based upon official Moroccan statistics as published in *Statistique du Mouvement Commercial et Maritime du Maroc*.

---

[16] See telegram No. 32, January 22, 1938, 11 a. m., to the Ambassador in France and telegram No. 132, January 25, 1938, noon, from the Ambassador in France, *Foreign Relations*, 1938, vol. II, pp. 851 and 854.
[17] Not printed.

638          FOREIGN RELATIONS, 1939, VOLUME IV

| Year | Total Imports From All Countries | Imports from U. S. of Products Listed in Annex | Percentage of Total Imports |
|------|----------------------------------|------------------------------------------------|-----------------------------|
|      | (Values in 1,000 francs)         |                                                |                             |
| 1927 | 1,798,508 | 78,392 | 4.4 |
| 1928 | 1,890,515 | 108,707 | 5.4 |
| 1929 | 2,547,430 | 173,402 | 6.8 |
| 1930 | 2,208,474 | 131,790 | 6.0 |
| 1931 | 2,075,191 | 95,968 | 4.6 |
| 1932 | 1,785,058 | 63,617 | 3.6 |
| 1933 | 1,532,416 | 61,432 | 4.0 |
| 1934 | 1,319,705 | 61,539 | 4.7 |
| 1935 | 1,139,138 | 60,705 | 5.3 |
| 1936 | 1,150,502 | 80,223 | 7.0 |
| 1937 | 1,785,624 | 93,188 | 5.6 |

It will be observed that my Government seeks also, in the Agreement, bindings of the duties on the same thirty-five items and bindings of the internal taxes on all but two of those items. The items included in the List represent products of which, according to Moroccan customs statistics for the years 1927 to 1937, inclusive, the United States was the principal supplier during one or more of those years and was in most cases the supplier of a preponderant share of such goods.

While there has not been incorporated in the treaty project an article corresponding to Article 2 of the Anglo-French Commercial Treaty of July 18, 1938, recognizing customs autonomy in relation to the French and Tangier Zones of the Shereefian Empire, the United States is prepared to give due consideration to the inclusion of such an article in the event the French Government so desires.

It is understood, of course, that the enclosed drafts are subject to revision during the negotiations.

Accept [etc.]

Cordell Hull

[Enclosure]

*Proposed Convention Between the United States and France for the Renunciation of American Extraterritorial Rights in the French Zone of Morocco*

PREAMBLE

The President of the United States of America, and the President of the French Republic, acting in his own name and on behalf of His Majesty the Sultan of Morocco;

Whereas the present special régime applicable in the French Zone of the Shereefian Empire to American consuls, nationals, protected

rights, companies, goods and ships is no longer in accordance with the present state of that Zone;

And whereas both High Contracting Parties are desirous of modifying certain treaties in order to render them thereafter in conformity with existing conditions:

Have accordingly decided to conclude a convention for this purpose and have appointed as their plenipotentiaries:

The President of the United States of America:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ;

and

The President of the French Republic:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ;

Who, having communicated to each other their full powers found in good and due form, have agreed upon the following articles:

## Article I

1. The United States of America agrees to renounce all rights and usages of a capitulatory character in the French Zone of the Sherifian Empire.

2. Specifically such renunciation shall be considered to include:

(i) The abrogation of the Treaty of Peace and Friendship, signed September 16, 1836;[*]

(ii) The relinquishment of the right of the United States of America to rely in the French Zone of the Sherifian Empire upon the following Articles of the Act of Algeciras: Articles 1 to 65, 70, 71, 4th provisions of Article 79 after the word "permit", 75, 76, 80, 97, 99 to 104, 113 to 119, while in Article 81 the words "by the competent consular authority" must be deemed to be omitted and in Article 95 the word "competent" must henceforth be substituted for the word "consular".

(iii) All rights and privileges acquired in the French Zone of the Sherifian Empire under the Convention of Madrid of 1880.

## Article II

1. American nationals, American-protected persons and American companies in the French Zone of the Sherifian Empire shall be subject to the jurisdiction of the same tribunals as French citizens and French companies.

2. In their recourse to such tribunals American nationals, American-protected persons and American companies shall be subject to the same conditions as French citizens and French companies.

3. No discrimination to the detriment of American nationals, American-protected persons, American companies, American ships, or

[*] Hunter Miller (ed.), *Treaties and Other International Acts of the United States of America*, vol. 4, p. 33.

**640**  FOREIGN RELATIONS, 1939, VOLUME IV

American aircraft or to the detriment of goods, the growth, produce or manufacture of the United States of America, shall be made by any legislation governing the French Zone of the Shereefian Empire, or shall be effected by administrative action in that Zone.

4. American Chambers of Commerce in the French Zone of the Shereefian Empire shall enjoy rights and privileges no less favorable than those accorded to the Chambers of Commerce of the most favored-nation.

5. The subjects of His Majesty the Sultan of Morocco and companies duly incorporated under the law of the French Zone of the Shereefian Empire shall enjoy in the United States of America the treatment of the most-favored-nation as regards access to the courts of justice.

### Article III

1. In respect of matters occurring before the entry into force of the present convention, laws and regulations of the French Zone of the Shereefian Empire shall only be applied to American nationals, American-protected persons, American companies and American ships in cases where in accordance with the existing practice such laws and regulations were then applicable to them.

2. Duties and taxes, however, payable under legislation, enacted less than one year before the date of the entry into force of the present convention and not yet made applicable to American nationals, American-protected persons and American companies by the Government of the United States of America, may be recovered from such nationals, protected persons and companies.

3. American nationals, American-protected persons and American companies shall not be sued in the courts of the French Zone for taxes or duties of any kind which became due more than two years before the coming into force of this convention.

### Article IV

1. The American courts at present exercising jurisdiction in the French Zone of the Shereefian Empire shall continue to deal with the cases regularly instituted before them before the entry into force of the present convention until these cases are finally completed.

2. Decisions which are final, given by the said courts within the limits of their jurisdiction, shall be recognized as having the force of *res judicata* by the authorities of the French Zone of the Shereefian Empire. Certificates given by the American consular officers to the effect that the said decisions are final will be accepted.

3. The United States of America undertakes to retain in Morocco during a period of twelve years from the date of the entrance into

tive of this convention, all the judicial records of the American consular courts. These records shall be open for inspection by the officials of the French Zone of the Shereefian Empire whenever due tribunals require them for the purpose of cases within their jurisdiction. Certified copies of these records will be furnished on request to the said tribunals, the competent authorities of the Zone and to any other properly interested party.

### Article V

1. Subject to the provisions of paragraphs 2 and 3 below, no person owing allegiance to His Majesty the Sultan of Morocco will claim in the French Zone of the Shereefian Empire the protection of the United States of America.

2. Natives of the French Zone of the Shereefian Empire, who at the date of the entry into force of the present convention enjoy American protection, whether as employees of an American consulate, as native or as protégés for signal services shall for the remainder of their lives be justiciable by the French tribunals of the Shereefian Empire except as regards matters coming within the jurisdiction of the Moslem or Jewish religious courts. Moreover, the like rights shall extend to American-protected persons of the Spanish Zone and of the Tangier Zone in respect of litigation in which they may be engaged in the French Zone. A list of the persons referred to in this paragraph shall be drawn up within six months of the coming into force of the present convention by agreement between the French Residency-General and the American Diplomatic Agency and Consulate-General at Tangier. This list shall include the wives and minor children of these persons living under the same roof, and the provisions of this paragraph shall apply in the case of the wives during the lifetime of their husbands, and in the case of the children until the death of their fathers or until their majority, whichever happens earlier.

3. The High Contracting Parties agree that the American consular authorities in the French Zone of the Shereefian Empire shall be competent to make representations to the competent authorities in favor of the persons mentioned in paragraph 2 above.

### Article VI

1. American nationals, American-protected persons and American companies shall enjoy in the French Zone of the Shereefian Empire the same personal and private rights (*droits privés*) as French and Moroccan nationals and French and Moroccan companies. They shall have the same guarantees for the protection of person and property; and they shall pay no internal taxes other or higher than those exacted of and paid by French or Moroccan nationals or companies.

642      FOREIGN RELATIONS, 1939, VOLUME IV

2. In addition to the rights granted in Article 2 and in the first paragraph of this Article, American nationals, protected persons, companies, goods, ships, and aircraft shall enjoy in the French Zone of the Shereefian Empire a regime of economic liberty without any inequality with French citizens, companies, goods, ships and aircraft, and with Moroccan subjects, companies, goods, ships and aircraft. The term "regime of economic liberty without any inequality" shall be understood to include, among other things:

(1) That with respect to customs or tonnage duties, charges in respect of warehousing and other facilities, port dues, or other duties, taxes, fees or exactions of whatever character appertaining to industry, trade, or commerce, there shall be no discrimination in law or in fact placing or tending to place nationals, protected persons, companies, goods, aircraft or ships of the United States of America at a disadvantage as compared with nationals, protected persons, companies, goods, aircraft or ships of any other country; and that any advantage, favor, privilege, or immunity which is or may be accorded to any article originating in or destined for any other country shall be extended unconditionally, immediately, without request and without compensation, to the like article originating in the United States of America, from whatever place arriving, or destined for the United States of America;

(2) That no import or export prohibition, restriction, or licensing system, including import or customs quotas and other forms of quantitative regulations affecting the importation, sale, or use of imported articles, shall be applied to articles originating in or destined for the United States of America which is other or more burdensome than that applied to the like articles originating in or destined for any other country. If a share of the total quantity of any article permitted to be imported or sold, or permitted to be imported or sold at a lower duty or charge than the duty or charge imposed on the importation or sale of quantities in excess of such total quantity is allotted to any other country, a share equivalent to the proportion of the total importations of such article which was supplied by the United States of America during a previous representative period shall be allotted to the United States of America;

(3) That, if any form of control of the means of international payment is established or maintained, such control shall be administered so as not to influence to the disadvantage of the United States of America the competitive relationships between articles originating in the United States of America and similar articles originating in any other country; and that no restrictions shall be imposed upon payments to American nationals which are other or more burdensome than those applied to payments to the nationals of any other country;

(4) That in regard to the right to acquire, possess and dispose of both movable and immovable property, in the pursuit of occupations, industries, or professions, and in all that pertains to facilities of every kind, including the prospecting for and utilization of natural resources, there shall be no discrimination;

(5) That in the granting of concessions of all kinds as well as in the granting of contracts for public works and in the purchase of supplies, there shall be suitable opportunity for competition and upon bidding free from any condition or provision calculated to give competitors of one nationality or the goods of a particular country any advantage over those of another; and

(6) That no monopoly or exclusive privileges shall be created or granted which would result in monopolization of the markets, resources, or facilities of the French Zone of the Shereefian Empire for the benefit of any special interests, directly or indirectly, or in any exclusive or preferential advantage inconsistent with the principle of complete equality of opportunity.

(7) (a) With respect to articles, the growth, produce or manufacture of the United States of America imported into the French Zone of the Shereefian Empire, on which ad valorem rates of duty are or may be assessed, the declared value for customs purposes shall be the net wholesale value of the merchandise at the time when and the place when presented to the customs, that is to say, the purchase value in the country of shipment, increased by the necessary charges for importation up to the place of entry (transportation, freight, insurance, lighterage, etc.), excluding customs duties and warehouse charges.

(b) The basis for the conversion of currency for customs valuation purposes shall be the latest available official buying rate of the State Bank of Morocco.

(c) In the event any dispute should arise regarding the assessment of customs duties under subsection (a) above, the customs shall either levy the duty in kind, then and there, or, if the merchandise is indivisible, take the said merchandise by at once paying the declarant its declared value, plus five percent, unless the importer and the customs shall mutually agree upon an adjusted valuation on the basis of which the duties may be levied in cash.

(d) The provisions of this paragraph shall not prevent the imposition of appropriate penalties in cases where fraud shall have been judicially established.

## ARTICLE VII

1. American nationals and American-protected persons shall not be subject in the French Zone of the Shereefian Empire to any compulsory personal military service nor to any tax or payment in lieu of such service.

2. The subjects of His Majesty the Sultan of Morocco shall enjoy in the United States of America the treatment of the most-favored-nation as regards the matter referred to in this Article.

## ARTICLE VIII

1. Extracts from "casier judiciaire" shall be delivered to American nationals and American-protected persons resident in the French Zone of Morocco on the same conditions as to French citizens. In order to enable the competent authorities of the Zone to deliver such extracts, the American consular authorities in the Zone will supply to these

authorities certificates as regards convictions, if any, prosecuted by the American consular courts in Morocco.

### ARTICLE IX

1. The United States of America shall have the right to maintain consulates at any place in the French Zone of the Shereefian Empire which is open to the consular representatives of any foreign country. The establishment of new consulates at other places in the said Zone shall be subject to the agreement of the Governments of both High Contracting Parties.

2. Pending the conclusion of a Consular Convention, American consular officers shall continue to enjoy the rights, privileges and immunities which they possess at present, particularly in the matter of all customs duties and other public dues. The foregoing stipulations do not include rights, privileges or immunities of a judicial character under the capitulations.

3. It is further agreed that American consular officers shall be treated in the French Zone of the Shereefian Empire no less favorably than the consular officers of any other Power.

### ARTICLE X

1. American schools of every grade shall continue to enjoy in the French Zone, especially in regard to the teaching of English, the same liberty as hitherto. They will be subject to the laws relating to State control which are applicable to all European schools in the French Zone.

2. Moreover, American missionaries, both those established in the French Zone of the Shereefian Empire at present and those who may come into the Zone in the future, shall enjoy the treatment of the most-favored-nation. However, nothing contained in this Article shall be considered as prejudicing in any way the rights enjoyed by American nationals in the French Zone of the Shereefian Empire under the terms of the Convention signed at St. Germain-en-Laye on September 10, 1919, (Revision of the General Act of Berlin of February 26, 1885 and the General Act and Declaration of Brussels of July 2, 1890) and more particularly under the provisions of Article 11 of that Convention.

### ARTICLE XI

1. Nothing contained in the present convention shall be construed to affect the right of the authorities of the French Zone of the Shereefian Empire to regulate admittance and immigration or to expel persons for reasons of police or public order or to enact and apply immigration regulations, provided that there is no discrimination against American nationals or American-protected persons.

MOROCCO                                          645

2. Nevertheless, American nationals and American-protected persons who have been resident in the French Zone of Morocco for more than five years shall not be expelled unless —

   (1) They have committed a crime or offense punishable with more than three months' imprisonment.
   (2) They have been guilty of conduct prejudicial to public safety, public order, good morals or public health.
   (3) They are in such a state of indigence as to be a burden to the State.

3. The provisions of paragraph 2 of this Article may be terminated at any time after the expiry of twenty years from the date of the coming into force of the present convention by six months' notice.

## Article XII

1. In case of the death of an American national in the French Zone of the Shereefian Empire without having any known heirs or testamentary executors by him appointed, the competent local authorities shall at once inform the nearest American consular officer of the fact of his death, in order that necessary information may be forwarded to the parties interested.

2. In case of the death of an American national in the French Zone of the Shereefian Empire without will or testament, the American consular officer within whose district the deceased made his home at the time of death, shall, pending the appointment of an administrator and until letters of administration have been granted, be deemed qualified to take charge of the property left by the decedent for the preservation and protection of the same. Such consular officer shall have the right to be appointed as administrator within the discretion of a tribunal or other agency controlling the administration of estates.

3. Whenever a consular officer accepts the office of administrator of the estate of a deceased American national he subjects himself as such to the jurisdiction of the tribunal or other agency making the appointment for all necessary purposes to the same extent as a Moroccan subject.

## Article XIII

1. An American consular officer may, in behalf of his non-resident nationals, receipt for their distributive shares derived from estates in process of probate or accruing under the provisions of so-called Workmen's Compensation Laws or other like statutes, provided he remit any funds so received through the appropriate agencies of his Government to the proper distributees, and provided further that he furnish to the authority or agency making distribution through him reasonable evidence of such remission.

646                FOREIGN RELATIONS, 1939, VOLUME IV

2. The subjects of His Majesty the Sultan of Morocco shall enjoy in the United States of America the treatment of the most-favored nation as regards the matters referred to in Articles 12 and 13.

## ARTICLE XIV

1. The High Contracting Parties agree that the French decree of the 8th November, 1921, relating to French nationality in the French Zone of the Shereefian Empire, and the Dahir of the same date, relating to Moroccan nationality, are not applicable to American nationals or protected-persons born before the date of the entry into force of the present convention.

2. If the French or Moroccan Governments should enact measures which would result in conferring French or Moroccan nationality by reason of birth or residence in the French zone of the Shereefian Empire in any case where the above-mentioned decree would not have conferred French nationality, American nationals and protected-persons affected by such enactments shall be freed from such French or Moroccan nationality if they make a request to this effect in the year which follows their majority.

## ARTICLE XV

1. The subjects of His Majesty the Sultan of Morocco and Moroccan vessels shall enjoy the same rights as French citizens and French ships in the United States of America, its territories and possessions.

2. The expression "Moroccan vessels" means ships duly registered as such in a port of the French Zone of the Shereefian Empire.

## ARTICLE XVI

1. For the purpose of the present convention the term "American companies" means any company duly incorporated under the laws of the United States of America or any of its states, territories or possessions, or any commercial association organized and legally recognized therein; and the term "American ships" means any ship duly registered therein.

2. The expression "French companies" means any company duly incorporated under the laws of France or any French colony, protectorate or territory under mandate, and the expression "French ships" means any ship duly registered in any of the above-mentioned territories.

3. The expression "Moroccan companies" means any company duly incorporated under the laws in force in the French Zone of the Shereefian Empire.

4. The term "Moroccan nationals" or "subjects of His Majesty the Sultan of Morocco" includes only those of His Majesty's subjects who enjoy French diplomatic protection abroad, but is not inclusive of

gies close protection is derived by virtue of Article 6 of the Convention of Paris of December 18, 1923.

The term "American goods" as used in this Convention shall be understood to mean goods the growth, produce, or manufacture of the United States of America, its territories, and possessions, and the term "Moroccan goods" shall be understood to mean goods the growth, produce or manufacture of the French Zone of the Shereefian Empire.

The most-favored-nation treatment promised in the present Convention is understood to mean that ... Articles ... not manufactured, used, shipped or aircraft, treatment no less favorable than accorded to the nationals, companies or ... goods, products, aircraft of any third country, excluding ... States.

## Article XVII

Any dispute between the High Contracting Parties relating to the negotiation or application of the provisions of the ... which they are unable to settle by diplomacy, shall ... on the application of one of them, be decided in accordance with the provisions of the Arbitration Treaty between the United States of America and France, signed at Washington on February 6, 1928, unless the High Contracting Parties shall agree on another method of settlement.

## Article XVIII

The present convention shall be ratified.

The instruments of ratification shall be exchanged at . . . . . . . .

The present convention shall enter into force thirty days after the date of exchange of ratifications.

In faith whereof the above named plenipotentiaries have signed the present convention and have affixed their seals hereto.

Done in duplicate, in the English and French languages, equally authentic, at . . . . . . . . , this . . . . . . day of . . . . . . . . , 1939.

---

760H.119

*Memorandum of Conversation, by the Chief of the Division of Near Eastern Affairs (Murray)*

[WASHINGTON,] January 24, 1939.

The French Ambassador called on me this morning, by appointment, to receive the Secretary's note of January 21, 1939 [13] and the draft instruments which we have prepared for purposes of negotiation looking to the termination of American capitulatory rights in the French Zone of the Shereefian Empire and to the establishment

---

[13] *Supra.*

# Exhibit U
# 2:21 cv-11888-SJM-APP

*Special*

## AFFIDAVIT OF ACKNOWLEDGEMENT

**I DECLARE** that the online collection of the Library of Congress contain a publication entitled the **U.S. CONGRESSIONAL SERIAL SET** and that the attached photocopies from the **59th Congress 2nd Session House of Representatives** *Document No. 326 pp title page and pages 459-460* are true representation from that work, now in the possession of _houston, lasean dejong, *Moor grantee/ beneficiary*, RECOVEYED, and GRANTED, on special deposit to the SEAN HOUSTON-*EL* FOUNDATION TRUST as trust res for the benefit of its beneficiaries.

**Further Affiant Sayeth Naught**

Performed in proper person, in his own right, who has attained the Age of Majority with *manifest special intent and purpose,* freewill act and Deed:

*I DECLARE,* under penalty of perjury under the laws of michigan and the united states of america that the foregoing is true and correct.  Executed: _____ 4th September ,2021 .

By: _houston, lasean dejong_____

**houston, lasean dejong,** *grantee/grantor/heir/beneficiary*
a private Moor americas aboriginal illinoisan national,
*"but not citizen of the united states for the district of columbia,
nor citizen of the united states of america in congress assembled."*
**SPECIAL DEPOSIT, PRIVATE, PRIORITY**

*locus sigilli* (seal)

I am over the age of 18 and not party to the transaction regarding the papers mailed.

nesbitt, david darnell
**Print**

lawson, tryone haxson Jr.
**Print**

**Witness**

**Witness**

*locus sigilli* (seal)

*locus sigilli* (seal)

KF125574909 US.
702
Trust



# State of Michigan



### DEPARTMENT OF STATE
### COUNTY CLERK CERTIFICATION

I, Jocelyn Benson, Secretary of State of the State of Michigan, and custodian of the Great Seal of the State, hereby certify that Lisa Brown, whose signature is affixed to the annexed instrument, was on the date thereof the duly elected or appointed and qualified Oakland County Clerk and the Clerk of the Circuit Court and all official acts as such should be given full faith and credit in all Courts of Justice and elsewhere.

IN TESTIMONY WHEREOF, I have hereto affixed my signature and Great Seal of the State, at Lansing, this 23rd day of December in the year of our Lord two thousand and nineteen.



*Jocelyn Benson*

Secretary of State

246468-1-634604-IH1

This certification is not valid unless prepared on an engraved border displaying the Great Seal of the State of Michigan.



LIBRARY

Office of Business
Duplication Services Program

THIS IS TO CERTIFY that the online collections of the Library of Congress contain a publication entitled U.S. CONGRESSIONAL SERIAL SET, and that the attached photocopies from 58ᵗʰ Congress, 2d Session, House of Representative Document No. 326 — the title page and pages 459-460 — are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on April 10, 2019.

Rosalind [illegible]
Assistant [illegible] Officer
Office of [illegible]
Library of Congress

50th Congress, } HOUSE OF REPRESENTATIVES. { Document
1st Session. } { No. 326.

## CITIZENSHIP OF THE UNITED STATES, EXPATRIA- TION, AND PROTECTION ABROAD.

### LETTER

FROM

# THE SECRETARY OF STATE,

TRANSMITTING

### REPORT ON THE SUBJECT OF CITIZENSHIP, EXPATRIATION, AND PROTECTION ABROAD

December 20, 1906.—Referred to the Committee on Foreign Affairs and ordered to be printed.

DEPARTMENT OF STATE,
*Washington, December 18, 1906.*

SIR: On the 13th of April, 1906, the Senate passed a joint resolution providing for a commission to inquire into the subjects of citizenship of the United States, expatriation, and protection abroad, and to make a report and recommendation thereon, to be transmitted to Congress for its consideration. This resolution carried an appropriation of $10,000 for its purposes of commission. (S. Res. No. 30, 59th Congress.)

On the 9th of June, 1906, the Committee on Foreign Affairs, to which this joint resolution was referred, reported to the House as follows:

It is the opinion of the committee that it is important to settle some of the questions relating to these subjects, such as those of citizenship, expatriation, and the protection of Americans resident abroad. The committee, however, is not convinced of the necessity of legislation in addition to consider these questions or to prepare legislation for submission to Congress. Such questions are not easy to be hastily considered, and apt to be ineffective.

It seems to the committee that the same results can be reached in a more practical way. More information on these questions is now furnished by those who have been obliged to deal with them practically than by any consideration of outsiders, however distinguished. We could be glad if the Secretary of State would select those of the gentlemen connected with the State Department who have given special attention to these subjects, have them prepare a report and propose legislation they thought be considered by Congress at the next session. The result of such a commission we are confident would be of value. If these were any small expense for clerk hire, etc., in connection with its work, this could, as we understand, be defrayed, under the direction of the Secretary of State, from the general appropriations made by Congress. If a bill regarding such subjects may exist is submitted at the beginning of the next session it will have the careful attention of this committee, and if its contents recommend, we will make every endeavor to have it promptly enacted into law. (Rept. No. 4384, 59th Cong., 1st sess.)

Pursuant to this suggestion of the Committee on Foreign Affairs, Mr. James B. Scott, solicitor for the Department of State, Mr. David

CITIZENSHIP OF THE UNITED STATES, EXPATRIATION, ETC. 469

CHAPTER V.—*Temporary provisions.*

ART. 1. Aliens who have acquired real estate, who have had children born to them in Mexico, or who have held any public office, being those referred to in sections X, XI, and XII of article 1 of this law, are bound to declare within six months after the promulgation of this law, provided they have not done so previously, to the civil authorities of their place of residence whether they wish to acquire Mexican citizenship or to retain their own. In the former case they must immediately ask for their certificate of naturalization in the form prescribed in article 19 of this law. If they fail to make the declaration in question, they shall be considered Mexicans, except in those cases where there has been an official declaration on this point.

ART. 2. Colonists residing in the country, being those referred to in the last sentence of article 28 of this law, shall declare in the manner prescribed by the preceding article under what nationality they wish to be classed, and if it should be the Mexican, they shall also ask for their certificate of naturalization, as prescribed by the preceding article.

ART. 3. The Executive, in issuing the necessary regulations for the execution of this law, shall be careful to give the proper directions in order that the local authorities, so far as they are concerned, may duly execute it.

[Signed]     JUAN JOSÉ BAZ, *Deputy, President.*
[Signed]     PEDRO SÁNCHEZ CASTRO, *Senator, President.*
[Signed]     ROBERTO NUÑEZ, *Deputy, Secretary.*
[Signed]     GILBERTO GÓMEZ, *Senator, Secretary.*

Wherefore, I order it to be printed, published, circulated, and duly executed.

Given in the national palace in Mexico, May 28, 1886.

PORFIRIO DÍAZ.

To Citizen IGNACIO MARISCAL,
        *Secretary of State and of the*
                *Department of Foreign Relations.*

In communicating it to you for your information and for the necessary purposes, I assure you of my great consideration.

MARISCAL.

---

Morocco.

*Mr. Philip, chargé d'affaires, to Mr. Root, Secretary of State, August 3, 1906.*

AMERICAN LEGATION,
        *Tangier, August 3, 1906.*

SIR:

*      *      *      *      *      *      *

There are, strictly speaking, no Moroccan laws relating to citizenship of Moorish subjects in Morocco. The fundamental laws of this non-Christian country are based entirely upon the Islamitic code, no part of which treats of the subject of citizenship.

400 CITIZENSHIP OF THE UNITED STATES, EXPATRIATION, ETC.

There are, however, numerous treaties and conventions between the various Christian countries and the Moorish Empire, by means of which citizenship in this country is defined; but, as I understand, from the above-acknowledged instructions, that it is not the desire of the Department to call for a report upon such lines, I will therefore confine these remarks to general conditions existing, which may possibly be of some use in connection with the information desired.

(1) Citizenship in Morocco may be said to be governed by the laws pertaining to the same in other countries, with the exception that all persons residing in Morocco who can not prove foreign citizenship or protection are considered ipso jure as Moorish subjects.

(2 and 3) Moorish subjects lost their nationality only by becoming naturalized in, or protected by, another country having treaty relations with the Moorish Empire.

It was established by the Convention of Madrid, concluded July 8, 1880, as follows:

### ARTICLE XV.

Any subject of Morocco who has been naturalized in a foreign country, and who shall return to Morocco, shall, after having remained for a length of time equal to that which shall have been regularly necessary for him to obtain such naturalization, choose between entire submission to the laws of the Empire and the obligation to quit Morocco, unless it shall be proved that his naturalization in a foreign country was obtained with the consent of the Government of Morocco.

Foreign naturalization heretofore acquired by subjects of Morocco according to the rules established by the laws of each country, shall be continued to them as regards all as and effects without any restriction.

The above ruling has never yet been acted upon, and should this at any time be contemplated seriously, a large number of naturalized people, Americans and others, residing in Morocco, would be affected thereby.

(4 and 5) Residence in foreign parts does not affect the nationality of Moorish subjects, and the Moorish Government has no means of protecting its subjects permanently residing in other countries, with the exception of a so-called Moorish consul at Gibraltar and a Moorish agent at Cairo, Egypt.

I am, etc.,

HOFFMAN PHILIP.

---

### NETHERLANDS.

[Enclosures in despatch from Mr. Hill, minister to the Netherlands, August 31, 1906.]

[Translation.]

LAW OF DECEMBER 12, 1892, REGARDING NETHERLANDS CITIZENSHIP AND RESIDENTSHIP.

[Official Gazette No. 268.]

In the name of Her Majesty Wilhelmina, by God's grace Queen of the Netherlands, Princess of Orange-Nassau, etc.
to all whom it may concern, that:

Having taken into consideration that it is desirable to establish some general provisions concerning Netherlands nationality in sub...

# Exhibit V
# 2:21 cv-11888-SJM-APP

# Special
## AFFIDAVIT of ACCEPTANCE and ACKNOWLEDGEMENT

**I DECLARE** that the online collection of the Library of Congress contains a publication entitled the ***STATUTES AT LARGE, COPIUS NOTES OF THE SUPREME COURT OF THE UNITED STATES ON TREATIES***, are a true representation from that work, and in the possession of _houston, lasean dejong, Moor grantee/beneficiary_, RECOVEYED, and GRANTED, on special deposit to the SEAN HOUSTON-*EL* FOUNDATION TRUST as trust res for the benefit of its beneficiaries.

**Further Affiant Sayeth Naught**

Performed in proper person, in his own right, who has attained the Age of Majority with *manifest special intent and purpose,* freewill act and Deed:

***I DECLARE,*** under penalty of perjury under the laws of michigan and the united states of america that the foregoing is true and correct.  Executed: _____4ᵗʰ September, 20 21_.

By: _houston, lasean dejong_
**houston, lasean dejong**, *grantee/grantor/heir/beneficiary*
a private Moor americas aboriginal illinoisan national,
*"but not citizen of the united states for the district of columbia,
nor citizen of the united states of america in congress assembled."*
**SPECIAL DEPOSIT, PRIVATE, PRIORITY**

*locus sigilli* (seal)

I am over the age of 18 and not party to the transaction regarding the papers mailed.

_Nesbitt, david darnell_
**Print**

_Lawson, tyrone batson Jr._
**Print**

_nesbitt, david darnell_
**Witness**

_laws, ty – bats J._
**Witness**

*locus sigilli (seal)*

*locus sigilli (seal)*


RE 125594 909 US. 702 Trust
Page 1 of 9

2:21-cv-11888-SJM-APP

# LIBRARY

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA**, and that the attached photocopies from Volume VIII – the title page, the publisher page, Letters page and pages 1 through 4 – are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on February 18, 2020.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



101 Independence Avenue, SE Washington, DC 20540–4917 Tel 202.707.5650 www.loc.gov;
duplicationservices@loc.gov

BY AUTHORITY OF CONGRESS.

THE

# Public Statutes at Large

OF THE

# UNITED STATES OF AMERICA,

FROM THE

ORGANIZATION OF THE GOVERNMENT IN 1789, TO MARCH 3, 1845.

ARRANGED IN CHRONOLOGICAL ORDER.

WITH

REFERENCES TO THE MATTER OF EACH ACT AND TO THE SUBSEQUENT ACTS ON THE SAME SUBJECT,

AND

COPIOUS NOTES OF THE DECISIONS

OF THE

## Courts of the United States

CONSTRUING THOSE ACTS, AND UPON THE SUBJECTS OF THE LAWS.

WITH AN

INDEX TO THE CONTENTS OF EACH VOLUME,

AND A

FULL GENERAL INDEX TO THE WHOLE WORK, IN THE CONCLUDING VOLUME.

TOGETHER WITH

The Declaration of Independence, the Articles of Confederation, and the Constitution of the United States;

AND ALSO,

TABLES, IN THE LAST VOLUME, CONTAINING LISTS OF THE ACTS RELATING TO THE JUDICIARY, IMPOSTS AND TONNAGE, THE PUBLIC LANDS, ETC.

EDITED BY

RICHARD PETERS, ESQ.,

COUNSELLOR AT LAW.

The rights and interest of the United States in the stereotype plates from which this work is printed, are hereby recognised, acknowledged, and declared by the publishers, according to the provisions of the joint resolution of Congress, passed March 3, 1845.

VOL. VIII.

BOSTON:
CHARLES C. LITTLE AND JAMES BROWN
1848.

Entered according to act of Congress, in the year 1846, by
CHARLES C. LITTLE & JAMES BROWN,
In the Clerk's office of the District Court of the District of Massachusetts.

# LETTERS.

---

"*To the Hon.* J. Y. MASON, *Attorney-General of the United States.*

"SIR:

"THE undersigned, the Joint Committee of the last Congress upon the Library, having had an opportunity of examining the first volume of the new edition of the Laws and Treaties of the United States, published by Messrs. Little & Brown, under the Resolve of the last session, passed in pursuance of the Report of that Committee, have thought it might not be improper to express an opinion upon this specimen of the work. And we have great satisfaction in saying, that it most fully answers the expectations with which we recommended, and with which, as we think, Congress invited, the publication of this edition. It conforms substantially to the plan which the Resolve instructed, improving upon it where it differs at all; is executed with great mechanical neatness; and, if the whole shall be completed as it is here begun, the Government, the Profession, and the Country, will have the entire series of all our Public and Private Legislation, in force or obsolete, and of all our Diplomacy, in a natural, easy arrangement, for consultation and reference; with very perfect indices, with references in the margin, and notes to all the other Statutes, Resolves, or Treaties, relating to the matter of the text, and to all Judicial Decisions of all the Federal Courts applicable to the same matter; constituting an absolutely authoritative national work. We learn that every law and treaty has been carefully collated with the originals in the Department of State.

"It was deemed of much importance that the judgment of the Attorney-General should be pronounced upon the successive volumes of the edition, as they should appear, and before they should be accepted, and we think the Publishers may with great confidence hope for your approval of this first of the series.

"We have the honor to be,

"With great respect,

"Your obedient servants,

"RUFUS CHOATE,
"BENJ. TAPPAN,      } *Committee on the part of the
"J. A. PEARCE,           Senate, 28th Congress.*

"EDMUND BURKE,
"W. B. MACLAY,       } *Committee on the part of
"GEORGE P. MARSH,    the House of Representatives, 28th Congress*

# TREATIES.

## TREATY-MAKING POWER.

By the ARTICLES OF CONFEDERATION of July 8, 1778, the following provisions were made relative to treaties by the United States:

Article 6, section 1.   "No state, without the consent of the United States, in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any confirmed agreement, alliance or treaty with any king, prince or state; nor shall any person holding any office of profit or trust under the United States or any of them, accept of any present, emolument, office or title of any kind whatsoever, from any king, prince or foreign state; nor shall the United States in Congress assembled, or any of them, grant any title of nobility."   Vol. I. 5.

SEC. 2.   "No two or more states shall enter into any treaty, confederation or alliance whatever between them, without the consent of the United States in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue." Vol. I. 5.

Article 9, sec. I.   "The United States in Congress assembled shall have the sole and exclusive right and power of determining on peace and war, except in cases mentioned in the sixth article; of sending and receiving ambassadors, entering into treaties and alliances, provided that no treaty of commerce shall be made whereby the legislative power of the respective states shall be restrained from imposing such imposts and duties on foreigners as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever; of establishing rules for deciding in all cases what captures on land or water shall be legal, and in what manner prizes taken by land or naval forces in the service of the United States shall be decided or appropriated; of granting letters of marque and reprisal in times of peace; appointing courts for the trial of piracies and felonies committed on the high seas; and establishing courts for receiving and determining finally appeals in all cases of captures; provided that no member of Congress shall be appointed a judge of any of the said courts."   Vol. I. 6.

SEC. 6.   "The United States in Congress assembled shall never engage in a war nor grant letters of marque and reprisal in time of peace, nor enter into any treaties or alliances, nor coin money, nor regulate the value thereof, nor ascertain the sums and expenses necessary for the defence and welfare of the United States, or any of them, nor emit bills nor borrow money on the credit of the United States, nor appropriate money, nor agree upon the number of vessels of war to be built or purchased, or the number of land or sea forces to be raised, nor appoint a commander-in-chief of the army or navy, unless nine States assent to the same, nor shall a question on any other point except for adjourning from day to day, be determined unless by the votes of a majority of the United States in Congress assembled."   Vol. I. 8.

THE CONSTITUTION OF THE UNITED STATES, article 2, section 2, provides — "He (the President of the United States) shall have power, by and with the advice and consent of the Senate, to make treaties, provided

1                                        A        (1)

two-thirds of the Senators present concur; he shall nominate, and by and with the advice and consent of the Senate, appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States whose appointments are not herein otherwise provided for, and which may be established by law." Vol. I. 17.

Article 6. "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." Vol. I. 19.

### CASES DECIDED IN THE COURTS OF THE UNITED STATES, AS TO THE OBLIGATION AND CONSTRUCTION OF TREATIES.

The obligation of a treaty, the supreme law of the land, must be admitted. The execution of the contract between the two nations is to be demanded from the executive of each nation; but where a treaty affects the rights of parties litigating in court, the treaty as much binds those rights, and is as much regarded by the Supreme Court as an act of Congress. United States v. The Schooner Peggy, 1 Cranch, 103; 1 Cond. Rep. 256.

The termination of a treaty, by war, does not divest rights of property already vested under it. Society for the Propagation of the Gospel v. The Town of New Haven, 8 Wheat. 464; 5 Cond. Rep. 489.

Nor do treaties, in general, become extinguished, ipso facto, by war between the two governments. Those stipulating for a permanent arrangement of territorial and other national rights, are, at most, suspended during the war, and revive at the peace, unless they are waived by the parties, or new and repugnant stipulations are made. *Ibid.*

Where a treaty is the law of the land, and as such affects the rights of parties litigating in court, that treaty as much binds those rights, and is as much to be regarded by the court, as an act of Congress. To condemn a vessel, therefore, the restoration of which is directed by the law of the land, though restoration be an executive act, would be a direct infraction of that law, and, of consequence, improper. United States v. The Schooner Peggy, 1 Cranch, 103; 1 Cond. Rep. 256.

A treaty, under the sixth article, section 2, of the Constitution, being the supreme law of the land, the treaty of peace of 1783 operated as a repeal of all state laws previously enacted, inconsistent with its provisions. Ware v. Hylton, 3 Dall. 199; 1 Cond. Rep. 90.

Whenever a right grows out of, or is protected by, a treaty, it prevails against all laws, or decisions of the courts of the states, and whoever may have the right under the treaty, is protected. But, if the person's title is not affected by the treaty, if he claims nothing under the treaty, his title cannot be protected by it. *Ibid.*

The stipulation in a treaty, that "free ships shall make free goods," does not imply the converse proposition, that enemy's ships shall make enemy's goods. The Nereide, Bennet, Master, 9 Cranch, 388; 3 Cond. Rep. 439.

A treaty is, in its nature, a contract between two nations, not a legislative act. It does not generally effect of itself the object to be accomplished, especially so far as its operation is infra-territorial; but is carried into execution by the sovereign power of the respective parties to the instrument. Foster et al. v. Neilson, 2 Peters, 314; United States v. Arredondo, 6 Peters, 735.

In the United States, a different principle is established. Our Constitution declares a treaty to be the law of the land. It is, consequently,

to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But, when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the court. *Ibid.*

By the stipulations of a treaty, are to be understood its language and apparent intention, manifested in the instrument, with a reference to the contracting parties, the subject matter, and the persons on whom it is to operate. United States *v.* Arredondo et al, 6 Peters, 710.

A treaty of cession is a deed of the ceded territory, and the sovereign is the grantee; the act is his, as far as it relates to the cession; the treaty is his act and deed, and all courts must so consider it; and deeds are construed in equity by the rules of law. *Ibid.* 738.

Where a treaty is executed in two languages, each the language of the respective contracting parties, both parts of the treaty are originals, and both are intended to convey the same meaning. *Ibid.*

Where a treaty has been ratified according to the provisions of the Constitution, it becomes the law of the land; and it is perfectly immaterial, whether or not the persons who signed it did or did not transcend their instructions. Hamilton *v.* Eaton, North Carolina Cases, 77.

A treaty does not necessarily annul prior statutes, if there is no interference with them. *Ibid.*

The stipulations in a treaty between the United States and a foreign power, are paramount to the provisions of the constitution of a particular state, or the confederacy. Lessee of Harry Gordon *v.* Kerr et al. 1 Wash. C. C. R. 322.

A treaty between the United States and one belligerent, does not affect a question of prize, as between two belligerents, where the prize (captured from the belligerent making the treaty) is brought by the other belligerent into the ports of the United States; nor is it important that the capturing vessel was commanded by an American citizen. The treaty can bind only the parties to it; and whatever operation it may have on the American citizen, individually, it cannot affect the general question of the validity of prizes made between belligerents. The Santissima Trinidad, 1 Brockenb. C. C. R. 478.

A judgment of a state court, where jurisdiction was acquired, not by the common law, but by a statute of a state, which, before the rendition of the judgment, had been virtually repealed by the adoption of a treaty, was voidable, and not void. Livingston *v.* Van Ingen, Paine's C. C. R. 55.

In 1780, the ancestor of the lessors of the plaintiff was indicted, he being a British subject, in the Supreme Court of New York, under the act entitled "An act for the forfeiture and sale of the property of persons who have adhered to the enemies of this state," &c.; and in October, 1783, a judgment of forfeiture against his estates was rendered. The treaty of 1783, against any subsequent confiscation, was signed in September, 1783. Held, that the proceedings were void. *Ibid.*

The stipulations of a treaty are paramount to the provisions of the constitution of a particular state of the United States. Gordon's lessee *v.* Kerr, 1 Wash. C. C. R. 322.

Whenever a right grows out of or is protected by a treaty, it is sanctioned against all the laws and judicial decisions of the states; and whoever may have this right is protected. But if the person's title is not affected by the treaty, if he claims nothing under the treaty, his title cannot be protected by the treaty. Owing *v.* Norwood's lessee, 5 Cranch, 344. 2 Cond. Rep. 275.

The adoption of a treaty, with the stipulations of which the provisions

of a state law are inconsistent, is equivalent to the repeal of such law Lessee of Fisher *v.* Harnden, 1 Paine, C. C. R. 55.

A treaty goes into operation from the date of the signature, if no other period is agreed upon between the parties.  Lessee of Hylton *v.* Brown, 1 Wash. C. C. R. 343.

The Constitution of the United States confers absolutely on the government of the United States the power of making war and of making treaties.  Consequently that government possesses the power of acquiring territory, either by conquest or by treaty.  The American Insurance Company *v.* 356 bales of Cotton, 1 Peters, 542.

The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace.  If it be ceded by treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession, or on such as its new master shall impose.  "On such transfer of territory it has never been held, that the relations of the inhabitants with each other are changed.  Their relations with their former sovereign are dissolved, and new relations are created between them and the government which has acquired their territory.  The same act which transfers their country transfers the allegiance of those who remain in it, and the law which may be denominated political is necessarily changed, although that which regulates the intercourse and general conduct of individuals remains in force until altered by the newly created power of the state.  *Ibid.*





PRIORITY MAIL
POSTAGE REQUIRED

UNITED STATES POSTAL SERVICE ®

PRIORITY MAIL SPECIAL

2:21 CV-11888-STM-APP

PRIORITY ★ MAIL ★

FROM: Houston, Jaslean Diyone / Mary,
c/o 3079 S. Baldwin Rd
Lake Orion, Michigan, RFD
near [4835?]

beneficiary

TO: Clerk of Court
district court of the United States
eastern district of Michigan
231 W. Lafayette Blvd Room #599
Detroit, Michigan [4822?]

FOR DOMESTIC AND INTERNATIONAL USE

RECEIVED
SEP 15 2021
CLERK'S OFFICE
U.S. DISTRICT COURT

01/7/21

US POSTAGE PAID
$8.55
Origin: 48098
09/07/21
2567350000306

PRIORITY MAIL 1-DAY®

EXPECTED DELIVERY DAY: 09/08/21

SHIP
TO:
231 W LAFAYETTE BLVD
Detroit MI 48226-2700

USPS TRACKING® #

9505 5117 7341 1260 3640 41

1 Lb 6.90 Oz
1022
C052

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE